AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Facebook account associated with Facebook ID #<br>100000733389950, https://www.facebook.com/shola760 | )<br>)<br>)<br>)<br>)<br>) |

Case No. **23MJ1837**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A and B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, 963 | Importation of controlled substances and conspiracy |
| 18 U.S.C. § 1001 | False statement |
| 31 U.S.C. § 5332 | Bulk Cash Smuggling |

The application is based on these facts:

See Attached Affidavit of H.S.I. Special Agent Conor Trombetta, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

CONOR D TROMBETTA  Digitally signed by CONOR D TROMBETTA
Date: 2023.05.24 10:10:19 -07'00'

*Applicant's signature*

HSI Special Agent Conor Trombetta

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 05/24/2023 _____

*Judge's signature*

City and state:  San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge

*Printed name and title*

# **ATTACHMENT A**

This warrant applies to information associated with the following Meta Platforms, Inc. accounts:

Facebook account associated with Facebook ID # 100000733389950,

https://www.facebook.com/shola760 (**subject account**); and

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, 1601 Willow Road, Menlo Park, California 94025

# ATTACHMENT B

## I.      Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.     Items Subject to Seizure

All subscriber and/or user information; all electronic mail; chat history; images; videos; text messages; histories; activity logs and all other documentation showing the user's posts and other account activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; pokes; tags; information about the user's access and use of account applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following accounts:

> Facebook account associated with Facebook ID # 100000733389950, https://www.facebook.com/shola760 (**subject account**);

## III.    The search of the data supplied by Meta Platforms pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited in time from **June 1, 2022 to July 27, 2022** and be further limited to:

The items to be seized shall be limited to:

  a. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

b. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to identify Joselin PACHECO, and any co-conspirators involved in the activities in III(a);

c. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

d. All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail;

e. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts; and

**Which is evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 (importation and conspiracy); and Title 18, United States Code, § 1001 (false statement); and 31 United States Code § 5332 and 18 United States Code § 371 (bulk cash smuggling onto or out of the United States and conspiracy to commit offense or to defraud United States).**

# AFFIDAVIT

I, Special Agent Conor Trombetta, being duly sworn, hereby state as follows:

## INTRODUCTION

1.      This affidavit is in support of an application by the United States of America for a search warrant for Internet Service Provider Meta Platforms, Inc., to search for records and data in and related to the following electronic communication and social networking account (the "**subject account**") (as described in Attachment A):

> Facebook account associated with Facebook ID # 100000733389950, https://www.facebook.com/shola760 (**subject account**), believed to be used by Joselin PACHECO.

2.      As more fully described herein, there is probable cause to believe that within the **subject account** will be found evidence of violations of federal law, namely violations of Title 18 United States Code, Section 1001 (false statements); Title 21, United States Code, Sections 952, 960, and 963 (importation of controlled substances and conspiracy); and 31 United States Code § 5332 and 18 United States Code § 371 (bulk cash smuggling onto or out of the United States and conspiracy to commit offense or to defraud United States) as further described in Attachment B.  The requested warrant relates to the investigation and prosecution of Joselin PACHECO ("Defendant") for importing approximately 29.54 kgs (65.12 lbs.) of cocaine from Mexico into the United States.  As detailed below, on August 25, 2022, PACHECO waived indictment and was arraigned on a single-count information charging PACHECO with importation of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 952, 960. The investigation into the drug smuggling and whether PACHECO made a false statement to federal officials in violation of 18 U.S.C. § 1001 is ongoing.

3.      The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement.

Because this affidavit is made for the limited purpose of obtaining a search warrant for the **subject account**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

4.     I have been employed as a Special Agent with Homeland Security Investigations (HSI) since February of 2011. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5.     During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

6.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing various communications platforms, including social media like Facebook. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to

remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity.  When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States. Moreover, in the event that drugs are seized by U.S. authorities at the ports of entry, it is common for narcotics traffickers to communicate about the seizure. These communications may occur weeks and months after the seizure and may include (i) discussion of the details of the seizure, (ii) discussions in which the courier provides proof that the narcotics were in fact seized (rather than stolen by the courier), and (iii) discussion of debt owed by the courier as a result of losing a load of narcotics, including efforts by narcotics traffickers to recover the value of the seized narcotics. Drug smugglers also post "trophy" photographs of their criminal activity, displaying images of smuggled drugs and drug proceeds as a way to boast of their exploits. Facebook allows its users to post such photos privately. Searches of social media like Facebook used by individuals involved in the importation of narcotics may yield evidence:

    a.      tending to indicate efforts to import controlled substances from Mexico into the United States;

    b.      tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

    c.      tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

    d.      tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7.   On July 27, 2022, at approximately 6:00 PM, Joselin PACHECO, ("PACHECO"), a United States citizen, applied for entry into the United States from Mexico through the San Ysidro POE in vehicle lane #26.  PACHECO was the driver, sole occupant, and registered owner of a 2006 Ford 500 bearing CA license plates (CA/9BKD077) ("**Vehicle**").

8.   A Canine Enforcement Team was conducting pre-primary operations when the Human and Narcotic Detection Dog alerted to the rear seat backrest of the vehicle.

9.   A Customs and Border Protection Officer received two negative Customs declarations from PACHECO. PACHECO stated he was crossing the border to go to San Diego, California.

10.   A CBPO operating the Z-Portal X-Ray machine detected anomalies in the rear seat and backrest cushion of the vehicle.

11.   A Canine Enforcement Team was conducting secondary inspection operations when the Human and Narcotic Detection Dog alerted to the rear bumper of the vehicle.

12.   Further inspection of the vehicle resulted in the discovery of 26 packages concealed in the rear seat and backrest of the vehicle, with a total approximate weight of 29.54 kgs (65.12 lbs.).  A sample of the substance contained within the packages field tested positive for the characteristics of cocaine.

13.   PACHECO was placed under arrest at approximately 9:15pm.

14.   At about 11:10 PM, PACHECO was advised of her *Miranda* rights. PACHECO stated that she understood her rights, and she agreed to be interviewed.

15.     First, SA Trombetta requested consent to search PACHECO's cellular device, both verbally, and then in writing utilizing a pre-printed consent to search form. PACHECO agreed both in writing and verbally.

16.     PACHECO then stated that she lives in Tijuana, Mexico and crosses north into the United States two to three times per week to see her husband, visit family, or buy clothing to resell online. PACHECO stated that on the day encountered she was crossing north to visit her brother in Escondido who was in the hospital and then going to see her husband.

17.     PACHECO stated that her day began with laundry, and then she went to pick up her **Vehicle**. PACHECO stated that the vehicle had a number of issues and that she dropped it off the previous Monday or Tuesday that week. PACHECO stated that she picked the car up at about 2PM to 2:30PM and then proceeded to drive to the San Ysidro Port of Entry to cross.

18.     PACHECO stated that she normally parks the **Vehicle** outside on the street in her neighborhood, that she is the only one who uses the **Vehicle** in both Mexico and the United States. PACHECO stated that she is the only person who has a set of keys to the Vehicle.

19.     At this point PACHECO spontaneously stated, "fucking assholes." PACHECO then went on to state that she knew that she was engaged in smuggling, but believed it was money. PACHECO stated that she knew it was dirty money, but believed she was transporting $20,000 USD north into the United States. PACHECO stated that she responded to a Facebook advertisement and was contacted by an individual in Mexico who instructed her to leave the keys in the gas tank door the night prior and for her to pick the **Vehicle** up at the mechanic the following morning. PACHECO stated she was going to be paid $1000.00 for the job. PACHECO stated that the individual in Mexico informed her that she would be contacted once she crossed and informed where to go for the Vehicle to be unloaded. PACHECO stated that she planned to wait at a restaurant until the Vehicle was returned.

20.    Immediately following the interview and arrest, Homeland Security Investigations (HSI) Special Agent (SA) Trombetta and performed an electronic extraction of the contents of PACHECO's phone utilizing the Cellebrite Universal Forensic Extraction Device program. This extraction included information and data about the phone itself, which listed the Apple ID as joselinpacheco.760@gmail.com and contained MSISDN: "17606700947" which corresponded to the phone number PACHECO provided during her interview.

21.    SA Trombetta conducted a review of PACHECO's phone, which identified the **subject account** (Facebook ID 100000733389950) utilized on the phone under the name "Joss Pacheco." SA Trombetta subsequently searched this Facebook ID and encountered a Subject Account under the name Joss Pacheco, url: https://www.facebook.com/shola760, which contained pictures that matched PACHECO and contained information stating her birthday was September 21, which matched the information provided during her interview.

22.    On August 25, 2022, PACHECO waived indictment and was arraigned on a single-count information charging PACHECO with importation of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 952, 960.

23.    Identification of the **subject account**: I identified the **subject account** through an open-source query. I concluded that the **subject account** is controlled by PACHECO because (i) a search of the Facebook ID obtained from PACHECO's phone resulted in subject account; (ii) the name on the subject account matched the name on the account identified during the forensic examination of PACHECHO's phone; (iii) subject account contained pictures of PACHECO, whom I am familiar from my interview and interaction with her on July 27, 2022; and (iii) because the subject account lists the same birthday as that provided by PACHECO during our interview on July 27, 2022.

24.     There is probable cause to conclude that PACHECO conspired to smuggle narcotics into the United States, smuggled narcotics into the United States, and made materially false statements to U.S. officials and that evidence of these crimes will be found in the **subject account**. PACHECO admitted to attempting to smuggle bulk currency, which she admittedly believed were illicit proceeds. She also told the CBPO at primary that she had nothing to declare, although she knew her vehicle was loaded with contraband. Moreover, there is probable cause to conclude that PACHECO's statements to agents during her post-arrest interview on July 27, 2022 were false. PACHECO's initial narrative, provided in her July 27, 2022, interview omitted any details regarding the currency smuggling. It was only after SA Trombetta confronted her with the inconsistencies of her narrative that she changed her narrative to alleging her belief that she was smuggling was bulk currency from illicit proceeds.

25.     There is probable cause to conclude that the existence or non-existence of communications regarding PACHECO's responses to the alleged Facebook advertisement will be found in the **subject account**. Moreover, PACHECO uses Facebook Messenger to communicate. The Facebook app was on her phone when she was arrested, and communications on the day she was arrested.

26.     Based on my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the **subject account** contain telephone numbers, contact names, email addresses, appointment dates, messages, pictures and other digital information relevant to the commissions the federal offenses listed.  In light of the above facts and my experience and training, there is probable cause to believe that PACHECO was using the **subject account** to communicate with others to further the importation of illicit narcotics into the United States.  Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. In the event that drugs are seized at the border (as in this case), drug smugglers commonly

communicate about the seizure for weeks or months thereafter, including to verify that the drugs were actually seized (and not stole) and to determine who is liable for the loss. Accordingly, I request permission to search the **subject account** for data beginning on June 1, 2022, up to and including July 27, 2022.

## BACKGROUND REGARDING META PLATFORMS

27.    Meta Platforms, Inc. a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. owns and operates free-access social networking websites Facebook and Instagram that can be accessed at http://www.facebook.com and http://www.instagram.com.

### Background Regarding Facebook

28.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

29.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only

to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.    Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that has that user tagged in them.

33.    Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated

with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

35.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

36.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

37.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

38.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

39.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40.  Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following

information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

41.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

42.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

43.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

44.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta Platforms are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Meta Platforms for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta Platforms.  The impact on Meta Platforms' business would be disruptive and severe.

45.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject account, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta Platforms, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow Meta Platforms to make a digital copy of the entire contents of the account(s) subject to seizure.  That copy will be provided to me or to any authorized federal agent.  The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

46.    Analyzing the data to be provided by Meta Platforms may require special technical skills, equipment, and software.  It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang.  Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves

to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

47.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

48.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

49.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

50.    The review of the **subject account** shall be limited in time from **June 1, 2022, to July 27, 2022**. This time range is supported by the facts of this case. As noted in paragraph 21, PACHECO alleged to have responded to a Facebook advertisement regarding currency smuggling. In addition, a review of PACHECO's phone indicated

that she utilized **subject account** to communicate on the day of her arrest. As noted in paragraph 6, in my experience, it is common for drug traffickers to discuss smuggling events – and seizures of narcotics – weeks and months after the event.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

51.    As noted above, review of Pacheco's phone provided some information from the **subject account**, however, did not provide a complete download of the account as requested by this warrant.

## CONCLUSION

52.    Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **subject account** will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, 960 and 963 (importation and conspiracy); Title 18, United States Code, Section 1001 (false statement); and 31 United States Code § 5332 and 18 United States Code § 371 (bulk cash smuggling onto or out of the United States and conspiracy to commit offense or to defraud United States). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

CONOR D TROMBETTA  Digitally signed by CONOR D TROMBETTA
Date: 2023.05.24 10:11:14 -07'00'

_____
Special Agent Conor Trombetta
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 24th day of May, 2023.

_____
Honorable William V. Gallo
United States Magistrate Judge

## **ATTACHMENT A**

This warrant applies to information associated with the following Meta Platforms, Inc. accounts:

Facebook account associated with Facebook ID # 100000733389950,

https://www.facebook.com/shola760 (**subject account**); and

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, 1601 Willow Road, Menlo Park, California 94025

# **ATTACHMENT B**

## I.        **Service of Warrant**

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.       **Items Subject to Seizure**

All subscriber and/or user information; all electronic mail; chat history; images; videos; text messages; histories; activity logs and all other documentation showing the user's posts and other account activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; pokes; tags; information about the user's access and use of account applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following accounts:

> Facebook account associated with Facebook ID # 100000733389950, https://www.facebook.com/shola760 (**subject account**);

## III.    The search of the data supplied by Meta Platforms pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited in time from **June 1, 2022 to July 27, 2022** and be further limited to:

The items to be seized shall be limited to:

   a. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to discuss, establish, or further drug trafficking or conspiracies to commit the same;

b. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, tending to identify Joselin PACHECO, and any co-conspirators involved in the activities in III(a);

c. Communications, records, and attachments, including but not limited to status updates, messages, posts, likes, comments, photos, and videos, that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

d. All photos and videos tending to establish or further drug trafficking or conspiracies to commit the same, identifying potential co-conspirators, or providing context to any relevant communications, records, photos, or videos or received or sent in temporal proximity to any relevant electronic mail;

e. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters related to the criminal activity under investigation, including records that help reveal their whereabouts; and

**Which is evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 (importation and conspiracy); and Title 18, United States Code, § 1001 (false statement); and 31 United States Code § 5332 and 18 United States Code § 371 (bulk cash smuggling onto or out of the United States and conspiracy to commit offense or to defraud United States).**